IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRYAN HOLDEN                              :

        Plaintiff                       :       CIVIL ACTION

v.                                        :       NO.


UNIVERSITY OF PENNSYLVANIA                :

        Defendant                       :       JURY TRIAL DEMANDED


## COMPLAINT

### I. PRELIMINARY STATEMENT

1. This is a complaint by Plaintiff Bryan Holden for retaliation and disability-related discrimination against the University of Pennsylvania under Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12186 *et seq.* and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §793 *et seq.*, (hereinafter "Section 504") for its discriminatory and retaliatory actions, culminating in his dismissal from the University's graduate nurse anesthesia program on June 19, 2014. Mr. Holden seeks a declaration that University's actions violate the ADA and Section 504. In addition, he seeks compensatory damages and reimbursement for the attorneys fees and costs he has incurred, and will incur, in the prosecution of this Action.

### II. JURISDICTION AND VENUE

2. Jurisdiction is predicated upon 28 U.S.C. § 1331, this being an action arising under the laws of the United States. Jurisdiction is further predicated upon 29 U.S.C. §794.

3. All of the actions complained of herein took place within the confines of the City of Philadelphia and the Eastern District of Pennsylvania.

### III. PARTIES

4. Bryan Holden is a citizen of the United States and the State of Ohio who resides at 1227 Laurence Road, Wyoming Ohio, 45215.

5. Plaintiff is an individual with a disability as defined by Title III of the ADA and and Section 504. 42 U.S.C. §29 U.S.C. §794.

6. Mr. Holden is a qualified individual with a disability because he meets the academic and technical standards required for admission or participation in the nurse anesthesia program at the University of Pennsylvania (hereafter "the University" or "Penn").

7. The University is a private educational institution, with its principal place of business located at 1 College Hall, Philadelphia, PA 19104.

8. Penn is a "public accommodation" as defined by Title III as it offers "examinations and courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional or trade purposes." 42 U.S.C. § 12182(a); 42 U.S.C. §12181(7). *See also* 28 C.F.R. § 36.104; 28 C.F.R. §36.102.

9. The University is a federal fund recipient for purposes of Section 504 and its School of Nursing is a "program and/or activity" which is supported, at least in part, by federal financial assistance. 34 C.F.R. §104.41.

### IV. STATUTORY AND REGULATORY BACKGROUND

10. Title III of the ADA (hereafter "Title III") prohibits discrimination on the basis of disability by private entities in places of public accommodation. 42 U.S.C. §12182(a). Section 504, likewise, prohibits discrimination on the basis of disability against any qualified person with a disability.

11. Title III defines discrimination, among other things, as denying a qualified person with a disability with an unequal opportunity to participate or benefit from the goods or services offered by public accommodation on the basis of such disability. 28 C.F.R. § 36.202 (a)-(b).

12. Section 504 provides that a qualified individual with a disability may not, on the basis of disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any post-secondary education program or activity or provided services or benefits which are different from or not equal to those provided to students without disabilities.

13. Federal fund recipients and public accommodations are required to make reasonable modifications to policies, practices, or procedures, as necessary to provide an individual with a disability an equal opportunity to participate and benefit from the services offered by the public accommodation, including, *inter alia*, making changes in the length of time permitted for the completion of the course, substitution of specific requirements, or adaptation of the manner in which the course is conducted or course materials are distributed.. 28 U.S.C. §36.302 (a); 28 U.S.C. §36.309.

14. Title III also precludes public accommodations from utilizing standards or criteria or methods of administration that have the effect of discriminating on the basis of disability, or that perpetuate the discrimination of others who are subject to common administrative control. 28 C.F.R. §36.204.

15. Both Title III and Section 504 prohibit retaliation against a person with a disability because they have opposed any act or practice made unlawful by those provisions. 28 C.F.R. §36.206; 34 C.F.R. §104.61.

## V. FACTUAL ALLEGATIONS

16. After a competitive selection process, Bryan Holden was accepted in Penn's graduate nurse anesthesia program and enrolled in the program on or about May 21, 2013.

17. Penn's nurse anesthesia masters program is a two year course of study which entails both a classroom and a clinical component.

18. Academic progress is tracked through grades. Clinical progress is reported daily in writing, simultaneously to both students and their advisors. This allowed students to monitor their progress and benefit from timely feedback from preceptors in each clinical setting, who vary from day to day, and to make adjustments or take other action to improve in areas identified by their clinical supervisors.

19. Prior to his admission to Penn, Mr. Holden earned a Bachelor's Degree in Biological Science, *summa cum laude*, from Lee University in 2005, followed by a Bachelor's of Science Degree in Nursing (BSN) in 2010 from the University of Cincinnati. He also worked for 2 years in a medical ICU unit in Cincinnati, Ohio.

20. Mr. Holden was diagnosed with ADHD when he was 11-years old.

21. ADHD is a disorder in the frontal lobe of the brain which impacts Mr. Holden's neurological functioning.

22. As is true for many people with ADHD, Mr. Holden also suffers from co-morbid anxiety, particularly performance anxiety.

23. Without mitigation, Mr. Holden's ADHD and anxiety substantially limit his brain and neurological functioning, and also impact his ability to concentrate, think, consolidate learning, and perform under pressure.

24. Although he sometimes needs additional time or extra practice to master a skill, Mr. Holden is intelligent and his impairments do not limit his cognitive abilities in any way.

25. Throughout his life, Mr. Holden has controlled his symptoms of ADHD and anxiety with a combination of medication and executive functioning strategies.

26. In spite of his disabilities, Mr. Holden has never allowed his disabilities to impede his performance as a nurse, either academically or clinically.

27. Mr. Holden chose to attend Penn because of the combination of its academic rigor and its advertised focus on the mentoring relationship and the ability to address the individual needs of its students. This was important to Mr. Holden in order to ensure that the services and supports he would need in a graduate nursing program because of his disabilities would be readily available to him.

28. In particular, Mr. Holden was attracted by Penn's simulation laboratory (SIM Lab) which would allow him the opportunity for extra practice which he often needed to consolidate learned skills and reduce anxiety before being called upon to perform in a live patient setting.

29. At all times relevant to this complaint, Russell Lynn was the Program Director for Penn's Nurse Anesthesia program. He was also Mr. Holden's assigned advisor.

30. At the end of June, 2013, Mr. Holden met with Professor Lynn to discuss the results of a classroom examination. Although Mr. Holden had received a "B" on the exam, he had been expecting a much higher grade.

31. During the meeting with Professor Lynn, Mr. Holden discovered that he had made an error transferring his answers onto the scantron. During the conversation he disclosed to Professor Lynn that he had ADHD and that he suffered from anxiety.

32. Mr. Holden told Professor Lynn that he was not currently taking medication and asked what services might be available at Penn to help him address the issue.

33. Professor Lynn referred Mr. Holden to the Student Disabilities (Weingarten) Center (SDS) for any assistance he might need in organization or study skills and also to Penn's Counseling And Psychological Services Center (CAPS) for treatment of his ADHD and anxiety.

34. SDS Center provides and coordinates Penn's delivery of services, academic adjustments, and auxiliary aids for purposes of it compliance with the ADA and Section 504.

35. Mr. Holden began receiving treatment and medication for his ADHD and his anxiety from one of the psychiatrists at CAPS. He also met regularly with a counselor/service coordinator at SDS.

36. Mr. Holden discussed with his counselor at CAPS that he needed more time in the SIM Lab and also expressed a concern that he was not getting the support he needed from faculty.

37. In spite of Mr. Holden's excellent clinical background, Lynn erroneously perceived his impairments as far more debilitating than they actually were and subjected him behind the scenes to extra scrutiny because of his disabilities and his unfounded expectation that because of those disabilities, Mr. Holden would present a safety risk and/or would be incapable of successfully completing the nurse anesthesia program.

38. In violation of federal privacy laws, Professor Lynn discussed Mr. Holden's disabilities and private medical information with other faculty as well as staff at Pennsylvania Hospital where he was assigned for clinical rotations.

39. During the next 6 months, Mr. Holden continued to make excellent academic progress and his daily reports from the clinical setting were mostly positive.

40. Although Mr. Holden made numerous requests for extra time in the SIM Lab, and his need for such supported was confirmed by some of his supervisors, he was provided only minimal opportunity for extra practice.

41. On November 5, 2013, Mr. Holden met with Professor Lynn and another faculty member to discuss his care plans and to request additional access to the SIM Lab. Lynn told Mr. Holden to speak with others on the faculty because time in the SIM Lab had to be supervised.

42. By November 5th, Lynn had widely disseminated his negative expectations about Mr. Holden to his clinical supervisors including preceptor Coleen Costick, who by that time had worked with Mr. Holden only once, on August 20, 2013, at which time she reported that he had done a good job.

43. The next two days, November 6th and 7th, Mr. Holden worked with Ms. Costick and received negative reviews, neither of which she provided to him. She reported directly to Professor Lynn that Mr. Holden was sometimes "shaky", anxious, and "disorganized."

44. Ms. Costick next worked with Mr. Holden on November 17th, a Sunday, after which she telephoned Professor Lynn to report that Mr. Holden was "not getting any better."

45. During the same time frame, other preceptors reported that Mr. Holden was doing well. Mr. Holden, however, was requesting additional time in the SIM Lab.

46. On November 26, 2013, Mr. Holden was called into an unannounced meeting with Professor Lynn. Also present was another faculty member, Angelarosa DiDonato, Jen String, a preceptor with whom Mr. Holden had worked only once, and Adrian Rodrigo, one of

the three Clinical Coordinators at Pennsylvania Hospital and someone Mr. Holden had never met before.

47. Professor Lynn began the meeting by apologizing for the lack of notice, explaining that he had not wanted to "make [Mr. Holden] nervous" or "distract him."

48. During the meeting, Lynn disclosed Mr. Holden's medical diagnoses, his treatment at CAPS, and his use of services at SDS.

49. Lynn presented Mr. Holden with an "Action Plan," purportedly drafted by "program faculty," which was already signed by one of the Clinical Coordinators at Pennsylvania Hospital who was not at the meeting and whom Mr. Holden had met for the first time that day.

50. Although Professor Lynn did not provide a clinical foundation for the Action Plan, he repeatedly stressed Mr. Holden's purported "distractibility" and "anxiety" which he presented as an issue of patient safety.

51. None of Mr. Holden's preceptors had ever indicated that he had done anything whatsoever to compromise patient safety.

52. Moreover, Mr. Holden was extremely concerned about patient safety, first and foremost, and took every precaution to ensure that patient safety took precedence over everything, even his own learning.

53. During the meeting Ms. DiDonato stated that she had only worked with Mr. Holden twice and both times had been "awesome."

54. The clinical preceptor, Ms. String, stated that she had limited experience working with Mr. Holden but agreed that he would benefit from some extra practice in the SIM Lab, something Mr. Holden himself had been requesting. Both the preceptor and the Clinical Coordinator agreed that Mr. Holden should be placed with a consistent preceptor to help solidify his skills in a consistent environment.

55. Lynn made no changes to the plan based on the input he received during the meeting and he demanded that Mr. Holden to sign it before he left.

56. The Action Plan contained no remediation services or accommodation to address the perceived deficiencies in Mr. Holden's clinical performance. Instead, among other things, it called for Mr. Holden to "decrease his anxiety levels" and meet with all applicable resources at CAPS by January 30, 2014, when the plan would expire.

57. After the meeting, Professor Lynn circulated the Action Plan to other faculty without Mr. Holden's consent and to all of the Clinical Coordinators at Pennsylvania Hospital. These coordinators had little to no direct interactions with Mr. Holden and no reason to know about his medical issues.

58. Mr. Holden continued to do well academically and received good feedback from his preceptors for the rest of the semester. He received a clinical grade of B+ and finished the semester with an overall GPA of 3.51.

59. When Mr. Holden returned after the Christmas break he continued to perform well in the clinical setting as indicated by his daily preceptor reports.

60. Meanwhile, Mr. Holden requested that he be placed at Cooper Medical Center for his cardiac rotation.

61. All students were allowed to request rotation site but for Mr. Holden, it was particularly important that he placed where he could be evaluated on the merit of his own performance, not through the lens of his disabilities which by that time, had become common knowledge among all of his supervisors.

61. On January 28, 2014, two days before the Action Plan was due to expire, Lynn denied Mr. Holden's request to do his cardiac rotation at Cooper based on Lynn's purported "fear" that allowing Mr. Holden to leave his primary site at Pennsylvania Hospital would *"make [him] nervous"* and serve as an *"additional distraction."*

62. Lynn provided no substantive basis for denying Mr. Holden's request, but denied that request on the sole basis of his disabilities, Lynn's erroneous and exaggerated perceptions of them premised on myths, fears, and stereotypes about ADHD and anxiety.

63. Approximately a week later, Lynn presented Mr. Holden with a second "Action Plan" based on the same purported "difficulties" from the Fall semester upon which he premised the first Action Plan.

64. Mr. Holden had solid clinical performance since the first Action Plan was put64. in place and Lynn provided no clinical basis for the second Action Plan.

65. Lynn acknowledged that Mr. Holden had been doing well but claimed to have had discussions with some of his preceptors regarding his "anxiety" and "distractibility," all elicited by Lynn himself through his inappropriate discussions of Mr. Holden's private medical issues with preceptors who had not raised them and had no need to know about them.

66. The second Action Plan contained the same goals as the first Action Plan and provided no services to remediate any of the deficiencies it purported to address.

67. On February 26, 2014 Mr. Holden was called into a meeting with Professor Lynn and to discuss an incident two weeks earlier, on February 11th, directly after the second Action Plan was put in place, which Lynn described as proof of Mr. Holden's inability to respond to an emergency.

68. Unbeknownst to Mr. Holden, his preceptor on February 11th, Coleen Costick, reported directly to Lynn that Mr. Holden had failed to notice a laryngospasm, which, had it happened, would have been an emergency event and would have triggered a specific reporting protocol. In fact there was no laryngospasm and no emergency event was ever reported that day.

69. Throughout the February 26th meeting, Lynn used the disputed events of February 11th to characterize Mr. Holden's entire clinical performance. He focused almost exclusively on his unfounded and exaggerated perceptions about Mr. Holden's attention and anxiety, and accused him of "missing things."

70. As a seasoned ICU nurse, Mr. Holden would not have missed a laryngospasm.

71. Lynn provided no objective data to support his concerns and ignored the mostly good clinical progress set forth on the daily preceptor reports.

72. Lynn said he did not think it was "ethical" to allow Mr. Holden to continue in the clinical and later that day informed him that he was not to return to clinical until further notice.

73. During the February 26th meeting Lynn did not provide Mr. Holden a copy of the report from February 11th. In fact, Lynn did not received it himself until the following day, February 27th.

74. Lynn directed Mr. Holden to provide him with a medical clearance from Dr. Alexander, the medical director of CAPS and whom Mr. Holden had never met, to ensure that "there isn't something going on that [the School of Nursing] didn't know about" and also to make sure that Mr. Holden was receiving "proper medical treatment."

75. Mr. Holden asked Professor Lynn to put his request in writing and to provide the objective data being used to pull him out of clinical. Lynn did neither.

78. Lynn's decision to pull Mr. Holden out of clinical was based on his perceptions of Mr. Holden's medical condition. Because of his of that condition, Lynn was holding him to standards not required of other students in an effort to create a record upon which he could dismiss him from the program.

79. On March 5, 2014, Mr. Holden attended a meeting with Professor Lynn, Dr. McCauley, Associate Dean and two other faculty members

80. During the March 5th meeting, Lynn presented Mr. Holden with a daily preceptor report from February 13, 2014, which Mr. Holden had never seen, and which the preceptor did not forward to Lynn until February 27th, the day after he banned Mr. Holden from clinical.

81. The February 13th report stated that Mr. Holden had "snapped at" his preceptor after she expressed disagreement with the amount of medication he administered during a spinal surgery, after which she allegedly asked him to leave the room.

82. Mr. Holden did not snap at his preceptor, did not over-medicate the patient, and was never asked to leave the room. His preceptor rated his professional demeanor that day as 3-4/5, or competent/nearly competent.

83. Lynn told Mr. Holden during the March 5th meeting that Dr. Alexander would not agree to provide him a medical clearance because of his concerns about Mr. Holden's participation in the clinical.

84. As of March 5th Mr. Holden had not yet met Dr. Alexander and Dr. Alexander did not see any need to release my Mr. Holden's medical information to the School of Nursing.

85. Lynn ended the meeting by refusing to allow Mr. Holden to return to clinical without a clearance from Dr. Alexander, something he was requiring only because of his erroneous and exaggerated perceptions of Mr. Holden's medical condition.

86. On or about March 14, 2014, Dr. Alexander provided a medical clearance for Mr. Holden to return to clinical. Lynn did not permit him to return, however.

87. A week later, on March 21st, Professor Lynn summoned Mr. Holden for another meeting and presented him with a "written warning" and probation document premised on the February 11th and February 13th preceptor reports, still neither of which had been disclosed to Mr. Holden.

88. Lynn attempted to coerce Mr. Holden into signing the document even though it was factually inaccurate and required him to satisfy competency standards not required of other students. Moreover, Mr. Holden had already missed more than a month of clinical, which had interrupted the continuity of his clinical experience, impeded his progress, and left him with less time than his counterparts to achieve and demonstrate clinical proficiency.

89. On March 24, 2014, Mr. Holden told Professor Lynn that he could not sign the document in its current form and gave him a formal request for accommodation including a "minimum of 30 minutes weekly access to the SIM Lab sessions to aid in development of [his]

technical skills" and a consistent clinical preceptor. Lynn remarked that this was the first time Mr. Holden had used the word "accommodation."

90. Professor Lynn went on to deny Mr. Holden's request for regular access to the SIM Lab. Instead, he offered two 1-hour sessions and said that if Mr. Holden needed any more during the probationary period, he would have to pay for them. Lynn also refused to even consider assigning Mr. Holden a consistent clinical preceptor although one could have been assigned without undue hardship to the University.

91. Penn's Nurse Anesthesia Handbook indicates that all students have access to the SIM Lab for individualized sessions and provides no indication that any student has to pay extra to schedule such sessions.

92. Later on March 24th, Professor Lynn wrote to Mr. Holden to inform him that he had an appointment the next day at SDS to discuss his "learning disabilities." In fact, Mr. Holden has ADHD and anxiety, neither of which is a learning disability.

93. Also on March 24th, Mr. Holden went to the SIM Lab for technical practice with Pete Conicelli, a lecturer and lab instructor, who had no reason to know about his medical condition or his academic standing. Mr. Holden thanked Mr. Conicelli by E-mail. When Mr. Conicelli wrote back four days later, he included negative criticisms he had not offered during the simulation session and, inexplicably, sent copies to Professor Lynn and to Lori Ann Winner.

94. Meanwhile, on March 25, 2014, Mr. Holden went to SDS to inquire as to whether it could help him secure the adjustments he needed during the probationary period.

95. Staff at SDS told Mr. Holden on March 25th and 26th that because the support he was requesting, i.e., access to the SIM Lab and a consistent preceptor, was "department-specific" and not on the list of accommodations SDS provides, it could not assist him.

96. The University provided no supervision or oversight to ensure that the School of Nursing was complying with the accommodation or anti-discrimination provisions of Title III and Section 504.

97. On April 1, 2014, Mr. Holden specifically placed the Department of Nursing on written notice that he was invoking his rights under the ADA.

98. On April 16, 2014, Mr. Holden met with Professor Lynn and Associate Dean McCauley to discuss his concerns regarding the Written Warning. While he was alone with Dr. McCauley, she told him that he because of his anxiety, he "[saw] the world differently" and not the way things really are.

99. On April 17, 2014, in order to return to clinical, Mr. Holden reluctantly signed a slightly redacted version of the Written Warning which placed him on probation.

100. By this time it was too late to withdraw from the clinical course. When he asked about the impact the 31-day absence would have on his grade, he was informed that he would receive a C+.

101. On April 22, 2014, Mr. Holden returned to clinical. Just six (clinical) days later, on April 30, 2014, he was permanently removed from clinical and told that he would fail the course.

102. Based on his failing grade, Mr. Holden would be ineligible to progress any further in the nurse anesthesia program and he was thereafter dismissed on May 7th.

-15-

103. The School of Nursing based its decision to remove Mr. Holden from the nurse anesthesia program on false documentation created on April 30th, purportedly demonstrating poor performance during the first case of the day, which did not go smoothly due to circumstances beyond Mr. Holden's control, and the second case which happened entirely after Mr. Holden left the room.

104. The anesthesia summary includes falsified information purportedly written by Mr. Holden when he was in the hallway talking to his wife on the phone. He had no contact with the patient, administered no medication, and made no notations to the chart.

105. The anesthesiologist, who was only in the room for five minutes, wrote on the preceptor's report that Mr. Holden's "personality" does not lend[ ] itself to this field because he is "nervous, easily distracted, and [ ] unable to multi-task." The anesthesiologist did not know Mr. Holden and was not qualified to comment on his personality.

106. Mr. Holden did not receive a copy of the April 30th report until May 21st, weeks several weeks after he had appealed his failing grade to the Academic Standards and Progressions Committee.

107. During a meeting on his grade appeal on June 9th, Mr. Holden was informed by the Committee that the reason he failed the clinical was because he was placed on probation in January and subsequently removed from clinical. In fact, he had not been placed on probation until April, by which time he had missed 31 days of clinical as well as the deadline for withdrawing from the course and after having been removed from clinical on February 22nd.

108. Mr. Holden requested the School of Nursing to allow him to withdraw from the clinical course without a grade. Alternatively, he requested that he be allowed to participate in the School of Nursing's remediation course which is available to students who require it whether or not they have a disability.

109. On June 10, 2014 the Academic Standards Committee advised Mr. Holden that he was being dismissed on the ground of "unsafe practice" on April 30th.

110. The School of Nursing denied Mr. Holden's request for reconsideration and upheld the failing grade, thus resulting in his permanent dismissal from the nurse anesthesia program.

111. As a result of Penn's ongoing discrimination against him and retaliation on the basis of his protected activity, Mr. Holden has suffered personal, professional, and financial harm as well as emotional distress and other compensatory damages.

112. Among other things, Mr. Holden took out approximately $100,000.00 in student loans to finance his graduate education, which he is now required to repay without a degree in nurse anesthesia.

113. Because of his dismissal from the nurse anesthesia program for "unsafe practice," Mr. Holden is ineligible to study for a nurse anesthesia degree in any other university.

114. The University's ongoing actions against Mr. Holden were intentional, discriminatory, and retaliatory and in violation of his rights under Title III and Section 504.

## VI. STATEMENT OF CLAIMS

### COUNT I: DISCRIMINATION

115. The allegations set forth in Paragraphs 1-113 are re-alleged and incorporated by reference herein.

116. The University's continuing actions as described above constitute illegal discrimination against Mr. Holden on the basis of his disability or perceived disability and deprived him of an equal opportunity to participate in the nurse anesthesia program because of his disability, including, but not limited to, its failure to provide him with services and supports afforded to students without disabilities, failure to provide reasonable accommodation, its demand for private medical information and disclosure of such information to staff, faculty and supervisors, unwarranted imposition of action plans, written warning, probation, failing grade, refusal to permit remediation, and dismissal from the nurse anesthesia program.

117. The University's discriminatory conduct violates Mr. Holden's rights under Title III and Section 504.

### COUNT I: RETALIATION PURSUANT TO TITLE III AND SECTION 504

118. The allegations set forth in Paragraphs 1- 117 are re-alleged and incorporated by reference herein.

119. Plaintiff's express and implicit requests for accommodation constituted protected activity under the ADA and Section 504, as does his explicit expression of intention to stand on his rights.

120. The University's adverse actions against Mr. Holden, including but not limited to placing him on probation without legitimate cause, falsifying documents, failing him in the clinical course, refusing to accommodate him or allow him to participate in the School of Nursing's own remediation program, accusing him of "unsafe practice" and dismissing him from the nurse anesthesia program are all causally related to his protected activity and because of that activity.

121. The University's adverse actions as described above constitute illegal retaliation pursuant to Title III and Section 504.

**WHEREFORE**, Plaintiff prays for the following relief:

1. A declaratory judgment that the University's actions as set forth above constitutes discrimination on the basis of Plaintiff's disability in violation of his rights under Title III and Section 504.

2. Award the Plaintiff compensatory damages for the financial losses, emotional distress, professional and personal harm, and other compensatory damages Plaintiff sustained as a result of the University's illegal actions.

3. Award Plaintiff and his counsel all costs and attorneys fees he has incurred or will incur in the prosecution of this action.

4. Award all other relief which may be just and proper under the circumstances.

Respectfully submitted,

**LORRIE McKINLEY, ESQUIRE**
Attorney I.D. No. 41211

**McKINLEY & RYAN, LLC**
238 West Miner Street
West Chester, PA 19382
(610) 436-6060
(610) 436-6804 (facsimile)

ATTORNEY FOR PLAINTIFF

DATE:    March 24, 2016